In the Matter of COLONIAL TRUST COMPANY et al., as Trustees under a Mortgage and Deed of Trust Made by 61 WEST 39TH ST. CORPORATION.

Supreme Court, Additional Special Term, New York County, November 26, 1946.

*Paine, Kramer & Marx* for Colonial Trust Company, trustee.

*Maurice Finkelstein* for S. H. Scheuer and others, bondholders.

*Alexander Klupt* for a group of bondholders.

*Stanley Bogart* for Monty H. Korovsky, bondholder.

*Hoffman, Bondi, Buchwald & Hoffman* for 61 West 39th St. Corporation, First Mortgage Bondholders' Committee.

BOTEIN, J. This is a proceeding brought pursuant to the provisions of section 122-a of the Real Property Law for a modification of the trust mortgage bonds and indenture given in a prior reorganization. It is proposed to modify these bonds and the indenture so that a new first mortgage might be raised upon the mortgaged property, the proceeds thereof distributed prorata among the bondholders in reduction of the principal amount unpaid upon their bonds, and the present first mortgage bonds thereby reduced to the status of second mortgage bonds.

In opposition to the foregoing proposed modification, it is urged that the scope of section 122-a is limited to plans of reorganization which " * * * provide for: (1) the extension of the maturity of the mortgage, deed of trust or indenture and the debts secured thereby "; and that any other proposed changes or modifications must relate to or be integrated with the above-quoted purpose. It is therefore argued that section 122-a was not intended to embrace the instant application for the modification of a trust indenture so as to permit the placing of a mortgage which would rank prior to the lien of the present indenture. And it is further argued that if section 122-a does allow the proposed modification, it violates the prohibition contained in section 10 of article I of the Constitution of the United States, that no State shall pass any law impairing the obligation of contracts.

I hold that the section is constitutional and that it is not restricted to the narrow limitations suggested by the objectants to this proposed plan, but may be properly invoked, in certain circumstances, for the authority to raise a new mortgage and subordinate the existing bonds.

Section 122-a sets forth a procedure to evolve a plan of reorganization which purports to modify a trust indenture formulated under a prior plan of reorganization. Such a plan of reorganization may be submitted prior to a default under the indenture and effectuated without a foreclosure. And the proposed plan, according to the terms of the statute, " * * * may provide for: (1) the extension of the maturity of the mortgage, deed of trust or indenture and the debts secured thereby; (2) the modification of the provisions for interest, amortization or sinking funds; and (3) such other changes, modifications or amendments as may be fair and feasible and for the best interests of the security holders."

The statute further provides for hearings on the plan thus submitted. Court approval of the plan is required and is con-

ditioned upon the court's determination that the plan is " fair, feasible and for the best interests of the security holders." After court approval, the plan is submitted to the security holders, and is deemed effective unless the holders of one third or more in principal amount of the outstanding securities file duly acknowledged dissents with the court. And even where the plan is adopted as aforesaid, a dissenter may obtain an appraisal of his securities and the payment or securing of " his ratable share ".

A literal construction of section 122-a, which expressly refers to the formulation of a " *plan of reorganization* * * * *of* the mortgage, deed of trust or indenture and the debts secured thereby ", does not permit of the suggested interpretation limiting its application to the extension of a maturity date. Reference, among its objectives, to " other changes, modifications or amendments ", together with the elaborate procedures and safeguards prescribed by section 122-a, furnish other internal statutory evidences of the legislative intent that applications pursuant to section 122-a should not be limited to maturity date extensions.

The best-grounded interpretation is that section 122-a has for its purpose the adaptation of prior plans of reorganizations to current economic circumstances affecting the status of the securities.

Viewed from the perspective afforded by the intervening years, the sharp outline of a legislative pattern emerges from the provisions of the Burchill Act (Real Property Law, §§ 119–123). The act originally provided that the indenture trustee could buy in the property (§ 119), and thereafter proceed either to operate it until a sale could be effected (§ 120) or to convey the property to a corporation pursuant to a plan of reorganization approved by the court and the security holders (§§ 121, 122).

Quite plainly, the design of the Burchill Act and the sequent Streit Act (Real Property Law, §§ 124–130-j) was to develop a comprehensive system for the orderly liquidation of investments in defaulted unguaranteed mortgage securities " to the end that such interests will be properly conserved, administered and ultimately liquidated in the public interest." (Real Property Law, § 124.) The acts thereby complemented and in many respects paralleled the statutory provisions made for the orderly liquidation of defaulted guaranteed mortgage securities (Schackno Act [L. 1933, ch. 745] and Mortgage Commission Act [L. 1935, ch. 19]). Distress sales of property securing defaulted mortgage investments were averted by this statutory scheme,

and provision was made for a more adequate method of exploiting the underlying security for the benefit of the investors. The act's provisions for the purchase, management, reorganization and sale of the underlying property are all part of the primary statutory objective to protect and tide over mortgage security holders' investments jeopardized by default.

The effectuation of the objectives of the Burchill Act was further implemented by the subsequent passage of the aforementioned Streit Act (Real Property Law, §§ 124–130-j), which made more definitive the authority and obligations of the indenture and voting trustees concerned with real property which constitutes the underlying security for mortgage investments. And in 1943 the Legislature enacted section 120-a of the Real Property Law (L. 1943, ch. 675), wherein the trustee was empowered to sell the mortgage and was thereby provided with another method of liquidating the mortgage investment.

In this statutory context the full import of section 122-a becomes apparent. It is an attempt by the Legislature to enlarge the statutory scheme for the orderly liquidation of defaulted unguaranteed mortgage investments by providing for a contingency not otherwise contemplated by the original plan or its implementing documents; for example, a change in economic conditions which renders an earlier plan anachronistic or an unforeseen development which warrants an adjustment in the plan to facilitate the orderly liquidation of the securities. Under section 122-a it is unnecessary to wait until these circumstances cause the debtor to default before action may be taken. Nor is it necessary to embark upon the tedious and expensive procedure of a foreclosure in order to launch a plan of action, as provided in section 122.

Where calculations as to future income made at the time of reorganization prove, in time, to be inaccurate, that contingency may be met simply by an extension of the maturity date. But many other contingencies may eventuate. The extension of the maturity date of the indenture and securities may not be sufficient to meet an economic situation not provided for adequately by the prior plan. Indeed, the new set of circumstances may render it unnecessary or inexpedient to extend the maturity date. Other means may be required. To limit section 122-a to a single type of exigency and to a single string for its bow would thwart the obvious purpose of the Legislature in executing a comprehensive and flexible statutory scheme for the liquidation of defaulted mortgage bonds. The structure and

history of, and the experience under the Burchill Act compel the conclusion that section 122-a encompasses the application here made for a plan modifying the indenture with respect to subordinating the present first mortgage bonds.

No objections on constitutional grounds would appear to defeat the legislative purpose evidenced by section 122-a. Section 10 of article I of the United States Constitution prohibits a State from impairing the obligation of a contract. But it may be suggested that this proceeding under section 122-a effects no impairment of a contractual obligation. "Impairment of an obligation means refusal to pay an honest debt; it does not mean contriving ways and means for paying it. The necessity compelled by unexpected financial conditions to modify an original arrangement for discharging a city's debt is implied in every such obligation for the very reason that thereby the obligation is discharged, not impaired." (*Faitoute Co.* v. *Asbury Park*, 316 U. S. 502, 511; see, also, *Matter of People* [*Tit. & Mtge. Guar. Co.*], 264 N. Y. 69, 95.)

Yet, if impairment of a contract obligation is the proper characterization of the consequences of a consummated plan under section 122-a, still the statute must be held to be constitutional. For where, as here, the contract right derives from a plan of reorganization formulated under State supervision and within the framework of a statutory scheme directed at the orderly liquidation of defaulted mortgage investments, it is evident that such a contract contains the intrinsic reservation that the State may thereafter exercise its police power in the furtherance of that policy of orderly liquidation. (*Veix* v. *Sixth Ward Assn.*, 310 U. S. 32; *Chicago, B. & Q. R. R. Co.* v. *Nebraska*, 170 U. S. 57.)

The more recent judicial pronouncements make it unnecessary to assert the State police power in the guise of a reservation contained in the contract. Contract rights protected by section 10 of article I can no more withstand the effective exercise of the police power than can the other property rights protected by the due process clause of the Fifth and Fourteenth Amendments. The appropriate inquiry under section 10 of article I was formulated in *Home Bldg. & Loan Assn.* v. *Blaisdell* (290 U. S. 398) and *Manigault* v. *Springs* (199 U. S. 473) and has been clearly articulated by Mr. Justice FRANKFURTER in *East New York Bank* v. *Hahn* (326 U. S. 230, 232–233): " * * * when a widely diffused public interest has become enmeshed in a network of multitudinous private arrangements, the authority

of the State ' to safeguard the vital interests of its people,' 290 U. S. at 434, is not to be gainsaid by abstracting one such arrangement from its public context and treating it as though it were an isolated private contract constitutionally immune from impairment.

" The formal mode of reasoning by means of which this ' protective power of the State,' 290 U. S. at 440, is acknowledged is of little moment. It may be treated as an implied condition of every contract and, as such, as much part of the contract as though it were written into it, whereby the State's exercise of its power enforces, and does not impair, a contract. A more candid statement is to recognize, as was said in *Manigault* v. *Springs, supra,* that the power ' which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the * * * general welfare of the people, and is paramount to any rights under contracts between individuals.' 199 U. S. at 480. Once we are in this domain of the reserve power of a State we must respect the ' wide discretion on the part of the legislature in determining what is and what is not necessary.' *Ibid.* So far as the constitutional issue is concerned, ' the power of the State when otherwise justified,' *Marcus Brown Co.* v. *Feldman,* 256 U. S. 170, 198, is not diminished because a private contract may be affected." Thus, contract rights — just as any other property rights — may be impaired where it appears that the Legislature has sought " To promote the general welfare " (*Shepherd* v. *Mount Vernon Trust Co.,* 269 N. Y. 234, 243) and the means employed are reasonably calculated to achieve that objective (*Matter of People* [*Tit. & Mtge. Guar. Co.*], *supra,* p. 94).

The foregoing criteria leave little doubt that section 122-a constitutes a proper exercise by the Legislature of its constitutional powers. The orderly liquidation of defaulted mortgage investments has been frequently held a matter within ' the scope of the police power. (*East New York Bank* v. *Hahn, supra; Home Bldg. & Loan Assn.* v. *Blaisdell, supra; Matter of People* [*Tit. & Mtge. Guar. Co.*] *supra; Matter of People* [*Westchester Tit. & T. Co.*], 268 N. Y. 432; *Matter of People* [*Lawyers Westchester M. & T. Co.*], 288 N. Y. 40; cf. *Shepherd* v. *Mount Vernon Trust Co., supra.*) And this aspect of the police power needs no express finding of an " emergency " to be invoked. (*Matter of People* [*Tit. & Mtge. Guar. Co.*], *supra,* p. 94; *East New York Sav. Bank* v. *Hahn,* 293 N. Y.

622, 628, 629; *Veix* v. *Sixth Ward Assn., supra,* p. 38; *Gelfert* v. *National City Bank,* 313 U. S. 221, 235.) The obvious public advantage that defaulted mortgage investments be liquidated in an orderly and competent fashion is sufficient occasion for the exercise of the police power.

The means here employed to implement the statutory objective must certainly be deemed " reasonable and legitimate ". As has already been indicated, reorganization is a reasonable method of facilitating liquidation. Indeed, the various procedural devices contained in section 122-a have previously been sustained. (*Matter of Mortgage Com. [1175 Evergreen Ave.],* 270 N. Y. 436, affd. *sub nom. Lauro* v. *Barker,* 299 U. S. 521.) And since the objective of and the means employed by section 122-a are otherwise unassailable, section 122-a is obviously not cast outside of the pale of constitutionality because it permits a plan of reorganization, modifying a prior plan, to be formulated without the expensive formality of a foreclosure where the debtor's identity is not altered by that modification.

The Legislature's cautious concern in drafting section 122-a must remove any lingering doubts as to its constitutionality. For it is specified, as previously quoted, that any dissenting security holder may obtain an appraisal and payment or securing of the value of his security. Under such circumstances, no security holder may reasonably complain that section 122-a impairs the obligation of his contract. The constitutional guarantee does not extend beyond the insurance that a contracting party will receive the full cash value of his contract right. (*Neblett* v. *Carpenter,* 305 U. S. 297, 305; *Matter of 16 Court Street,* 57 N. Y. S. 2d 887, 889; *Gelfert* v. *National City Bank* 313 U. S. 221, 233, *supra*; *Richmond Corp.* v. *Wachovia Bank,* 300 U. S. 124, 130; see, also, *Matter of Witherbee Court Corporation,* 88 F. 2d 251, certiorari denied *sub nom. Klee Corp.* v. *Roosevelt,* 301 U. S. 701; *Home Bldg. & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 425, 432, 433, 445, *supra.*)

I shall now consider the merits of the amended plan submitted herein by the equity owner. The holders of more than two thirds in principal amount of the outstanding bonds have consented affirmatively in writing to a plan not as advantageous to bondholders as the one recommended by the referee. A presumption is thereby created under section 122-a that the plan " is fair, feasible and for the best interests of the security holders." When, as here, the court cannot with any assurance evaluate the interweaving and unpredictable factors which

enter into a determination of the fairness and feasibility of the proposed plan, it must give great weight to the presumption created by the expressed wishes of so large a number of bondholders (see *Matter of Central Zone Property Corp.*, N. Y. L. J., May 25, 1946, p. 2079, col. 2). The plan has been fairly and clearly presented to bondholders, and there has been no evidence of overreaching by the owner. When, as now, current sales often indicate a clash between reality and realty values, when speculators trade upon psychological and political factors coequally with economic considerations, no court can venture an opinion as to whether time will prove this proposed plan to be feasible, or infeasible, prudent or imprudent. In such circumstances it is the plain intent of section 122-a that the court yield to the holders of two thirds in principal amount of the bonds a prevailing voice in shaping the future of their securities.

Strong arguments can be arrayed for and against the proposed amended plan. It is proposed that the proceeds of the new mortgage, together with certain sums in the hands of the trustee and contributions to be made by the owner, be distributed to bondholders on account of principal. This cash distribution will be 60% if the new mortgage is in the amount of $950,000. I am informed that two commitments for a mortgage in this amount have recently been secured. The obvious disadvantage of the plan lies in the subordination of the 40% unpaid principal of the bonds to the lien of the new first mortgage. The security of this balance, which will become reduced to the status of second mortgage bonds, will be thereby weakened.

On the other hand, the bonds do not mature until 1958, and no cash distribution of principal is possible before that time under the present indenture. The prices quoted upon the open market for these bonds over the years have ranged from a low of about 20 to a highest quotation of about 75. Thus, bondholders desiring part of their principal may under the proposed plan obtain a substantial portion of the realizable value of the bonds upon the market. While I am not as sanguine as is the referee as to the future sustained earnings of the building, I will grant there is some justification for his optimism.

Of course, there can be little quarrel with the proposition that the most desirable action that could be taken from the viewpoint of the bondholders would be to sell the property in the present high market. This would realize par or close

to par on the bonds. However, there is no likelihood that the owner would sell unless it could realize a substantial profit over and above the principal of the outstanding bonds, and such a price is not visible in the offing. So possible sale of the property is ruled out as an alternative.

Accordingly, I am in substantial agreement with the recommendations of the referee, with the few modifications hereinafter set forth.

Paragraph 1 of the proposed amended plan is modified so as to recite a new first mortgage of $950,000 instead of $850,000 and wherever else the amount of the new first mortgage is set forth it shall be in the sum of $950,000 or more. It follows that the provisions for distribution of an amount equal to 55% of the principal amount of the bonds be amended to provide for distribution of 60% or more.

Article X of the original indenture should be amended so as to provide that the failure to pay the interest and amortization on the new first mortgage shall constitute an event of default which would entitle the trustee to foreclose upon the subordinated lien.

Paragraph 8 of the proposed amended plan is modified so as to provide that the corporation should accumulate the sum of $50,000 instead of $25,000 as a guaranty fund, and that this amount be deposited, as accumulated each year, with the trustee instead of being held by the corporation. Except as modified herein, the motion to approve and confirm the referee's report is granted.

Before any further action will be taken in respect of bondholder approval, pursuant to the provisions of section 122-a, the owner corporation will be required to file its acceptance of the amended plan, as modified, with the clerk of the Additional Special Term, together with a commitment by a lending institution to make a first mortgage loan as indicated in the amended plan, in a sum of at least $950,000, and for the highest obtainable amount, which commitment shall hold good for a period of sufficient duration to consummate the proposed plan. If the consummation of the plan requires liquidation or discharge of the present mortgage, attention is drawn to section 120-a of the Real Property Law. Settle order.