J. Vincent Keogh, J.
In October of 1956, the Brooklyn Fox Corporation presented for approval by this court under section 122-a of the Real Property Law, a plan for the extension of a mortgage on its property and of an outstanding issue of income bonds secured by that mortgage, from the present maturity date of August 1, 1957, to August 1, 1967. It also sought the extension to July 31, 1967 of a 20-year lease on the theatre portion of its premises, which currently contains an expiration date of July 31,1957.
The petitioner is a New York corporation owning and operating the Fox Theatre & Office Building located at Flatbush Avenue and Nevins Street in the borough of Brooklyn, city of New York. The property is on an irregularly shaped plot and comprises most of the area contained in a triangular block bounded by Flatbush Avenue, Nevins and Livingston Streets approximating 28,815 square feet. The improvements were erected in 1927 and include a 12-story cellar and penthouse office and store structure known as No. 1 Nevins Street, at the corner of Flatbush Avenue, and a motion picture theatre equal to approximately eight stories of the office building height, and with cellar and subcellar.
The petitioner was organized pursuant to a plan of reorganization approved by the United States District Court for the Southern District of New York by order dated April 16, 1937. The reorganization was effected in behalf of the holders of $5,650,000 principal amount of first mortgage fee 6%% gold bonds of Flatbush Avenue and Nevins Street Corporation. In accordance with the plan, each holder of a $100 gold bond was entitled to receive $50 in principal amount of petitioner’s income bonds and voting trust certificates representing one share of the petitioner’s capital stock.
*504 The assets of the Flatbush Avenue and Nevins Street Corporation were conveyed to petitioner under the plan and it then executed a mortgage and deed of trust constituting a mortgage lien on its property, securing $2,825,000 of its 3% income bonds due August 1, 1957. It issued such income bonds totalling $2,825,000 to the holders of the first mortgage fee 6%% gold bonds, totalling $5,650,000, and delivered 56,500 shares of its capital stock to voting trustees for distribution of voting trust certificates representing such stock to the holders of the gold bonds. It also entered into a lease dated July 30, 1937 with Fabian Brooklyn Theatres, Inc. for a term of 20 years expiring July 31, 1957, concurrently with the maturity of the new income bonds.
At the time of the 1937 reorganization, large amounts of New York City real estate taxes and penalties were due and owing, and it became necessary to raise sufficient funds to pay these taxes and the expenses of reorganization, and to provide working capital for the new corporation. For this purpose, petitioner borrowed $725,000 from RFC Mortgage Company on a first mortgage on its property, and $75,000 from Simon H. Fabian on a second mortgage.
The income bondholders’ mortgage securing the income bonds thus became and constituted a third mortgage, junior in lien to the first and second mortgages aforesaid.
Under the 1937 plan, the net income from the property was to be applied first to the payment of interest on the income bonds up to 3% per annum, and the balance, if any, deposited in a sinking fund for the purchase and retirement of income bonds at prices not exceeding the face amount of the bonds. Upon reduction of the outstanding bonds to $1,800,000, the excess of net income was to be allocated one half to the sinking fund and the balance to corporate purposes, including payment of dividends.
The theatre lease provides for a minimum rental of $150,000 per armnm plus additional rent of 17%% of the annual gross receipts of the theatre in excess of $1,500,000. The lessee is also required to pay 62% of the cost of heating the theatre and office building, to maintain the theatre premises and make all repairs thereto except structural repairs, to contribute $1,000 a year to a fund for structural repairs, and to absorb a portion of any increase in real estate taxes over a stipulated amount.
At the time of the presentation of the petitioner’s plan in October of 1956, the income bonds had been reduced from $2,825,000 to $2,532,150, the voting trust agreement had terminated and there were outstanding 56,500 shares of capital stock. *505 The income bonds and capital stock were owned by a large number of persons some of whom owned income bonds but no stock; others owned stock but no income bonds; some owned both.
Currently, the outstanding bonds amount to $2,494,700, of which $1,233,350 are held or controlled by a group referred to herein as the “ Fabian Interests ”, consisting of Simon H. Fabian, Eleanor Fabian Rosen, and corporations in which he or members of his family have a financial interest. One million two hundred sixty-one thousand and three hundred fifty dollars are held by. numerous other persons. The current outstanding stock amounts to 55,571 shares, of which 19,030 shares are widely held, and 36,721 shares are owned by the “ Fabian Interests ”. The tenant is still Fabian Brooklyn Theatres, Inc., but it has sublet the theatre premises to Fabian Enterprises, Inc., which is now the tenant in possession. Fabian Enterprises, Inc. is wholly owned and controlled by either Simon H. Fabian or various of the “ Fabian Interests ”.
The petitioner’s original plan, dated October 16, 1956, provided for the extension of the maturity date of the mortgage and outstanding income bonds to August 1, 1967, with no other changes being made. The theatre lease was likewise to be extended for 10 years to July 31, 1967, with no other changes being made therein.
The plan came on to be heard after notice to all interested parties, including bondholders and stockholders, and publication in the New York Times on the 20th day of November, 1956. Two hundred sixty-four income bondholders, holding bonds in the outstanding amount of $1,702,750 were present or represented by counsel, including the $1,233,350 owned by the “ Fabian Interests ”. Two hundred thirty-four of the income bondholders owning $262,800 in principal amount of income bonds were represented by the Brooklyn Fox Theatre and Office Building bondholders committee, which appeared through attorneys.
There were numerous hearings, conferences and consultations concerning the within application. Witnesses were produced and testimony was adduced. Experts, designated by the court, testified and were cross-examined. Exhibits were offered in evidence. Extensive oral argument and discussion was permitted and encouraged in view of the special and unique nature of the reorganization process. Various alternate plans of reorganization and amendments were filed, - together with briefs or memoranda on the facts and the law.
*506 In an effort to narrow the area of difference among the interested parties, the court conferred with representatives of the petitioner and the bondholders.
The evidence established that in the 19 fiscal years since the 1937 reorganization, petitioner, in addition to having paid all its operating and maintenance expenses, has paid out of its cash revenues (including partial realization of a claim against Fox Theatres Corporation, which was one of the assets acquired in the 1937 reorganization) an aggregate of approximately $2,556,052 for mortgage principal and interest as follows: $725,000 in full payment of the RFC first mortgage; $264,090 for interest on said first mortgage; $75,000 in full payment of the second mortgage given to Simon H. Fabian ; $28,378 for interest on the said second mortgage;. $1,244,114 for interest on the income bonds, and $219,470 for retirement of $292,850 principal amount of income bonds.
The full 3% income interest on the income bonds has been paid since 1946. A .sinking fund operated out of net income since 1951. The gross receipts of the theatre have been such as to result in payment of rent exceeding the minimum rental of $150,000 per annum in 13 of the 19 years of petitioner’s existence, to and including 1956.
The property has been managed carefully and economically. Rentals approximate the rentals of similar office buildings.
The theatre has been operated by Mr. Simon H. Fabian, whose reputation, business acumen and ability in the motion picture field has been conceded by the bondholders and whom the court holds in the highest esteem. The rent reserved in the theatre lease appears to be higher than rentals available from theatre operators for comparable theatre space.
Full compliance was had with the terms of the mortgage and deed of trust. No default has ever occurred.
Notwithstanding all of the foregoing, the petitioner has been unable to amortize the income bonds nor has it been able to refinance the mortgage, despite efforts in that direction.
The petitioner advanced numerous reasons for the extension sought by it. Although not presented precisely in the order and form which follows, the reasons are substantially as follows:
(1) Its history of performance entitles it to the extension;
(2) Unanticipated economic contingencies bear the responsibility for its inability to amortize the income bonds ;
(3) Efforts to amortize the income bonds via mortgage financing have been unavailing because of an unanticipated, rigid and difficult mortgage market;
*507 (4) A sale of the property under present market conditions, and especially by reason of the special nature of an important portion of the property which yields more than half the gross rental, would not produce sufficient net proceeds to pay the income bonds in full, and would be detrimental to the interests of the income bondholders;
(5) An extension would enhance the possibility of liquidating the income bonds under conditions more nearly likely to produce higher liquidation amounts;
(6) It has negotiated a commitment from Fabian Enterprises, Inc. (a financially responsible corporation owned or controlled by some or all of the “ Fabian Interests ”) for an extension of the theatre lease on the same rental terms as currently provided; and
(7) It qualifies for an extension under section 122-a of the Real Property Law, in that in addition to the above reasons, it will be able to service the extended debt structure during the proposed extension period and make substantial reductions in the outstanding amount of the income bonds.
The Brooklyn Fox Theatre and Office Building bondholders committee originally contended that the statute suggests that there is a mandate upon the court to inquire into the preliminary question as to whether the plan promotes and facilitates the orderly liquidation of the securities. If the plan accomplishes that objective, extension is warranted, otherwise not. This committee also argued that if the evidence is not decisive in the direction of either extension or sale, the court could approve a plan with conditions designed to insure that the mandate of liquidation be favored under more propitious circumstances.
Various of the other bondholders were concerned chiefly, in the preliminary phases, with the question of the value of the property, and in the later stages, with the nature and degree of conditions to be imposed in exchange for an extension. This view ultimately was taken by the committee as well, more detailed reference to which is made hereinafter.
In evaluating the evidence against the background of the issues thus tendered and in determining whether or not the statute is properly applicable to the situation at bar, the court is mindful of the purpose and intent of section 122-a of the Real Property Law.
It represents an expression of the legislative intent to enlarge the statutory scheme .(Streit Act [Real Property Law, §§ 124-130-k]), for an orderly liquidation of defaulted mortgage investments, by provision for contingencies not otherwise con *508 templated by earlier plans of reorganization (a judisdictional prerequisite — satisfied in this proceeding by virtue of a previous plan of reorganization having been approved in the United States District Court).
“ The best-grounded interpretation is that section 122-a has for its purpose the adaptation of prior plans of reorganizations to current economic circumstances affecting the status of the securities. * * * for example, a change in economic conditions which renders an earlier plan anachronistic or an unforeseen development which warrants an adjustment in the plan to facilitate the orderly liquidation of the securities.” (Matter of Colonial Trust Co., 189 Misc. 335, 339, 340.)
While the intent and purpose of section 122-a seems clear enough, its application to a given set of facts can present some difficulty. Viewed literally, the section appears primarily to be designed for the benefit of the holders of the securities sought to be extended. On the other hand, it also explicitly provides for the employment thereof by an owner-mortgagor for the express purpose of extending the maturity of a mortgage.
Since the purpose of any reorganization proceeding is “ to permit a company to readjust its affairs in order to continue as a going concern ” (Matter of Minnesota & Ontario Paper Co., 7 S.E.C. Jud. Dec., 456, 531) and since section 122-a has been held to be a reorganization statute (New York, Trust Co. v. Textile Properties, 44 N. Y. S. 2d 50, affd. 268 App. Div. 765) a plan which provides the bondholders with a more favorable return than could be expected on liquidation or a sale, is obviously a plan which gives full effect to the language, intent and purpose of the statute and supplies a modus vivendi under the statute for. both bondholders and the owner.
This view finds support in another approach as well. The statute requires that the plan must be “ fair,” and “ feasible.” These or similar words (“fair and equitable”) have been interpreted as requiring the exclusion of junior security interests from participation in a plan of reorganization unless the position of the senior interests upon reorganization constitutes the full equivalence or compensation for their old securities. “ Each security holder must be compensated as exactly as he can be for that which he is giving up. But though his cup must be filled level to the brim, it must not run over.” (Matter of Securities & Exch. Comm., 142 F. 2d 411, 419, affd. sub nom. Otis & Co. v. Securities & Exch. Comm., 323 U. S. 624.)
Patently, then, full effect can be given to the requirement of the statute for the benefit of the security holders and an extension may be granted to an owner, if full equivalence is *509 given to the bondholders in the extension period (Matter of Waern Bldg. Corp., 145 F. 2d 584).
Whether “ full equivalence ” is given, turns on the method by which the assets of the owner are valued. For reorganization purposes, the basic criterion of value is earning power. If the earning power of the assets is sufficient to cover all requirements of the extended creditor securities, it may be said that they have received ‘ ‘ full equivalence, ’ ’ that they are being compensated as exactly as they can be for that which they are giving up. (Matter of Securities & Exch. Comm., supra.)
“ Reorganization is an effort to maintain the debtor as a going concern in order to provide maximum protection to the security and equity interests in the debtor’s enterprise. Fundamental to the reorganization process is the conception that if the debtor is granted additional time or an intelligently adjusted financial structure the earnings of the debtor as a going concern will provide the various interests with a more favorable return than could be expected upon liquidation or an outright sale of the debtor’s assets. The emphasis in reorganization upon the continuance of the debtor enterprise is most evident in Section 122-a of the New York Real Property Law which governs here. That section is so solicitous of the continued conduct of the debtor’s enterprise that, as distinct from the ordinary Burchill Act reorganization (see Section 122, New York Real Property Law), it does not even require a foreclosure. Consequently, the reorganization ‘ value ’ of an enterprise— and particularly of this Chanin Building leasehold — is its value as a going concern to its security and equity holders, and the reorganization ‘ value ’ of an enterprise is premised upon the ability of that enterprise to service its security and equity interests. Reorganization valuation must, therefore, consider earnings in terms of the debt structure to be serviced and not in terms of the return on investment sought by a prudent investor who is interested in purchasing the enterprise. Market value is no adequate indication of the going concern value of an enterprise to its security and equity interests.” (Matter of Lexington Ave. & 42nd St. Corp., Report of Ref. Benjamin J. Rabin, dated March 4, 1946, mod. by Mr. Justice Bernard Botein by order made June 26, 1946, Supreme Court, New York County, index No. 11967/1945.)
It is clear from all of the foregoing, that an extension is warranted if found by the court to be conducive to the orderly liquidation of the securities in question. If the plan promotes this aim; if there have been changes in economic conditions which render an earlier plan anachronistic; if there exist devel *510 opments, circumstances and contingencies which give warrant for an adjustment to facilitate the orderly liquidation of the securities coupled with proof that an extension (as contrasted, for example, with forced sale or partial refinancing) will facilitate and promote liquidation, and if ‘ ‘ full equivalence ’ ’ is given to the income bondholders, then extension may be approved.
Equally, however, the court is no mere agency to indorse an owner’s plan of extension. It may refuse to approve of the owner’s plan or impose conditions with respect thereto. It may take a middle course and permit extension upon compliance by the owner with conditions.
The evidence and plans and amendments were evaluated in these terms with the consideration in mind that the application of the statute requires “ Practical adjustments, rather than a rigid formula ” (Consolidated Rock Prods. Co. v. Du Bois, 312 U. S. 510, 529). The reorganization process, as in the case of adversary litigation between private parties, requires negotiation and compromise. “ [CJompromises, settlements and concessions are a normal part of the reorganization process ” (Group of Investors v. Milwaukee R. R. Co., 318 U. S. 523, 565).
In support of the petitioner’s case for extension, various projections were made of bonds to be retired from sinking fund operations during the proposed extension period. Each projection rested on the assumption that the sinking fund would purchase bonds at 80% of face value and that the interest rate on the bonds would continue at 3% per annum.
The first of these projections hypothesized that the sinking fund in 1957 from available net income and other sources would be $43,015, representing the average of the amounts transferred during the prior six years. It resulted in mortgage bonds outstanding in 1968, in the estimated amount of $1,768,075.
The second projection hypothesized a sinking fund availability of $50,020 per annum, representing the average of the amounts transferred during the prior three years, and resulted in mortgage bonds outstanding in 1968 in the estimated amount of $1,651,500.
The third projection approached the analysis on the assumption of annual net income availability of $114,550, and projected an outstanding amount of bonds in 1968 estimated at $1,817,700.
Each of these estimated results, produced by these conditional and qualified predictions, was not firm in amount, since the assumptions upon which they rested were subject to variables by reason of the possibility of realizing additional moneys on *511 the Fox Theatre claim, changes either upwards or downwards in income and changes in market prices of the bonds during the extension period.
It is sufficient, however, for the court’s purposes, to point out that the record gives fair and substantial warrant for the conclusion that the bonds would be substantially reduced in the proposed extension period. Naturally, of course, if the interest rate were to be higher, the total reduction in outstanding bonds would be less.
At the inception of the proceedings, the court appointed Eugene J. Keely, to appraise the value of the land and building and personal property contained therein. Such an appraisal was made by Mr. Keely, with a supplemental appraisal being made by Mr. Thomas Connors, an expert in theatre values and rentals.
The conclusion reached by Mr. Keely was that the fair market value of the property was $1,700,000 and this was defined as the highest price which the property would bring if exposed for sale in the open market, allowing a reasonable time to find a purchaser who buys with knowledge of all uses to which it is adapted and for which it is capable of being used. The conclusion reached by Mr. Connors was that the present rate of rental for the theatre premises was financially advantageous to the petitioner.
Mr. Keely’s opinion reflected valuation by the capitalization process, employing an over-all capitalization rate of 8% distilled from the habits of buyers in the market for the property involved. He approached the problem of valuation from two other points of view as well, viz., comparison with sales and cost of structure plus land value. He expressed the view that reproduction cost had little influence in determining market value and that there was sufficient activity in the real estate investment market to rely on the capitalization process. In reaching the ‘‘ market value ” conclusion of $1,700,000 however, Mr. Keely limited his opinion by making a number of assumptions, viz., (1) that the theatre lease would be renewed for at least 10 years and (2) that it would be guaranteed by Fabian Enterprises, Inc. On cross-examination he added that his concept of a market at $1,700,000 was not that there was a current market at that figure but that there might be one within a year or two.
Mr. Keely also made a stabilized estimate of income, which clearly indicated the projected ability of the property to yield a larger measure of interest for the bondholders in the extension period.
*512 Mr. Frank Fox, a large bondholder with extensive real estate experience, testified as to his opinion of the value of the property and suggested some higher valuation.
Extended testimony was adduced concerning the efforts of the petitioner to refinance the mortgage with a view to liquidating the bonds. Nothing was shown to warrant the conclusion that there were any realistic possibilities in this direction:
The court finds: (1) that refinancing is not feasible at the present time and a new mortgage to pay the income bonds, either in full or in substantial part, is not now obtainable; (2) that the probable market value of the property in the existing market is such as likely to result in the production of a price substantially below the amount of the existing bonds, with the consequence that a sale of the property either in the within proceedings or resulting from a refusal of the court to approve an extension, with the probable end result of foreclosure proceedings followed by sale, would substantially injure the bondholders ; (3) that, on the other hand, an extension on better terms than those originally proposed by the petitioner would undoubtedly benefit the income bondholders and make for a realistic and orderly ultimate liquidation of the bonds, directly responsive to the requirements of section 122-a of the Real Property Law.
Counsel appearing before the court, in general, shared these views, since, in suggesting alternate plans and amendments to the original plan filed by the petitioner, their proposals dealt largely with such matters as the amount of interest to be paid, fixed sinking fund requirements, proposed subordination of the income bonds of the Fabian interests, designation by the court of a director, provisions prohibiting cancellation of the lease etc.
No attorney representing bondholders advanced the claim that a sale would be preferable to an extension, that the bonds could be refinanced now or in the near future, or that an extension on fair terms were not more conducive to the orderly liquidation of the bonds than either sale or refinancing.
The alternate suggestions actually constituted the argument by representatives of the bondholders for ‘‘ full equivalence ’ ’ for the income bonds in exchange for the extension.
During the course of the proceedings, counsel for the committee undertook to persuade the petitioner to make a better offer to the income bondholders. His efforts were successful in that the negotiations among the attorneys for the committee, the attorneys for the Fabian interests and the petitioner and subsequent consultation with the court resulted in the concrete *513 expression of the willingness of the petitioner to offer more to the income bondholders than had been proposed theretofore.
This took the form of a plan which will be called the “ Joint Plan, ’ ’ providing for reclassification of the present outstanding bonds in the amount of $2,494,700 as follows:
One million seven hundred thousand dollars to be designated as senior bonds, comprising $1,261,350 of widely held bonds and $438,650 of bonds held by the Fabian interests. The balance of $794,700 (owned by the Fabian interests) to be designated junior bonds subordinate to the senior bonds. Interest is to be paid on the senior bonds at 4% per annum; on the junior bonds at 4% per annum, but only after payment of interest on the senior bonds and payment into the sinking fund of the sum of $30,000 per annum. The maturity date of the bonds is to be extended for 10 years from the present maturity date, and a lease of the theatre is to be entered into with Fabian Enterprises, Inc., for 10 years from July 31, 1957. The lease is to be assigned to the trustee, as additional security, and is to be noncaneellable by the petitioner or the lessee, excepting with the consent of two thirds of the senior bondholders and the approval of the court.
Various provisions are contained in the Joint Plan to effectuate such plan and to protect the bondholders, including amendments and changes in the trust indenture.
The Joint Plan further provides for changes in the corporate structure of the petitioner whereby common stock having full and exclusive voting rights will be issued to the Fabian interests, share for share, for their present common stock, and the issuance of preferred stock having a par value of $2 per share with a cumulative dividend rate of 4% per annum and subject to redemption after one year at par plus accrued dividends. The preferred stock shall be issued to others than the Fabian interests, share for share.
The Joint Plan is a compromise between what the bondholders desire and what the petitioner originally proposed. Whereas the original plan provided for interest, if earned, at the rate of 3% per annum, as now being paid, and continued payments of available net income into a sinking fund, as at present, the Joint Plan provides for a division of the bonds into senior and junior bonds, as explained above. Under such arrangement, bonds of the Fabian interests in excess of 64% of their holdings are subordinated to the bonds otherwise held. The sinking fund is to be used for the sole and exclusive benefit of the senior bondholders, for the purchase of senior bonds on the bond market, by tender, or otherwise, and for such other *514 purposes as may be provided in the trust indenture to be executed under the plan. The Joint Plan further proposes an extension of the lease on the theatre for an additional 10 years from July 31, 1957 upon the terms and conditions as explained above.
One of the plans submitted on behalf of one of the largest groups of other holders, proposes an interest rate of 5% per annum and total subordination of the bonds held by the Fabian interests, and 2% amortization. While this would result in an increase in interest to the extent of 1% per annum, the payment of 2% per annum into the sinking fund would amount to only $26,000 on the amount of senior bonds, and less as such bonds are reduced; this in contrast to the Joint Plan which calls for a fixed amount of $30,000 per annum. It should be noted that the Fabian interests have consented to subordinate almost two thirds of their holdings to those of the other bondholders.
The willingness of the Fabian interests to subordinate a portion of their bonds is another major contribution by the petitioner.
There was some innuendo that because the Fabian interests, in purchasing bonds, enjoyed the benefit of better sources of information than was available to other bondholders, there should be compulsory subordination of their bonds.
No evidence was adduced to support this contention. On the contrary, the testimony reflects that the Fabian interests were, if anything, overscrupulous in their regard and respect for the rights of all bondholders and wherever the possibility of conflict arose, they subordinated their interests.
At the inception of the proceedings, counsel for Mr. Fox questioned the jurisdiction of the court. Such counsel, Mr. Wildermuth, was designated along with Mr. Bernard Buchwald, attorney for the Committee, to report to the court their findings as to jurisdiction. This issue had been extensively briefed by Mr. Buchwald. Mr. Wildermuth, after examination of the afore-mentioned brief, expressed satisfaction that the court had appropriate jurisdiction.
During the course of the proceedings a motion was made by the attorneys for several bondholders for an order modifying the original order to show cause to the extent of vacating the provision therein that the filing of the petition herein and the institution and pendency of these proceedings shall not constitute an event of default under the mortgage and deed of trust and authorizing the trustee to declare the principal of and interest on the bonds to be due and payable immediately, and for other and alternative relief.
*515 This motion, in effect, sought a declaration that the filing of the petition itself is an event of default. Were the court to declare that such filing constituted an event of default, the literal basis for the proceeding would fall. The court finds that there is no contractual or legal warrant for the position thus advanced. The motion is denied.
The court therefore approves the Joint Plan and finds it fair, feasible and for the best interests of the security holders. The court finds that it provides the bondholders “ the full equivalence ” of their rights and compensate them as exactly as can be in exchange for the extension. The court finds that the petitioner is entitled to an extension of the maturity of the mortgage and income bonds to August 1, 1967 upon and subject to the conditions and provisions of the Joint Plan.
Some problems are encountered in implementing this conclusion of the court by reason of the fact that the Joint Plan is expressly conditioned upon the petitioner’s effecting changes in its corporate structure and the willingness of the Fabian interests to subordinate their bonds. The extension of the lease is a condition both from the point of view of the bondholders on the one hand and the Fabian interests on the other hand. Further, the court regards the feasibility of the Plan as turning, at least in part, upon the extension of the lease.
The court is not prepared to hold that its jurisdiction under section 122-a of the Real Property Law does not encompass the power to order changes in the corporate structure and to require an extension of the lease, but no ruling in these connections is necessary since the court is clearly empowered to exact conditions for approval of the Joint Plan. The mechanics for approval outlined below will effectively resolve this problem.
The court directs that before the submission and entry of an order approving the Joint Plan, a definitive plan consistent with this opinion as well as the proposed assignment of the lease to Fabian Enterprises, Inc. and extension thereof, and all such documents or other instruments necessary to subordinate the bonds of the Fabian interests shall be submitted by petitioner on or before the adjourned date, March 25, 1957. At the same time, the drafting committee heretofore appointed by the court, Messrs. Buchwald, Hauser, G-ans and Nussenfeld, shall submit the proposed supplemental or modified trust indenture.
The court is mindful that the revised trust indenture must • be approved by certain governmental agencies, and to effectuate the plan certain opinions must be obtained from such or other governmental agencies. It is assumed that the entire plan as set forth is subject to such approval and favorable opinions.
*516 Thereafter, an order will be settled, which, aside from other necessary provisions, shall provide that the plan approved by the court shall be deemed binding on all holders of the bonds unless within 20 days after approval of such plan, the holders of one third in principal amount of the outstanding bonds shall file with the court duly acknowledged dissents therefrom.